JOHN T. BRADY CORPORATION v. INTERNATIONAL-GREAT NORTHERN R. CO. (No. 8680.) *

(Court of Civil Appeals of Texas. Galveston. July 1, 1925. Rehearing Denied Oct. 15, 1925.)

1. Adverse possession ⟐⟐23—Evidence held insufficient to establish title by "adverse possession" as defined by statute.

In action for trespass to try title, evidence that railway cut trees on land adjacent to tracks and used such land temporarily to store materials was insufficient to establish title by adverse possession, under Rev. St. art. 5681, defining "adverse possession" as actual, visible appropriation of land under claim of right inconsistent with and hostile to claim of another.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Adverse Possession.]

2. Adverse possession ⟐⟐10—Railway may acquire title to land by adverse possession of part actually used.

A railway may acquire land under statute of limitations by adverse possession, and an easement so acquired extends only to land actually used.

3. Adverse possession ⟐⟐103 — Possession of part of land under record title to whole gives constructive possession of whole.

Actual possession under record title of a portion of a tract of land over which right of way is claimed by railroad gives constructive possession of all land not otherwise occupied, and enables railroad to acquire title by adverse possession only to land actually occupied.

4. Appeal and error ⟐⟐1011(1)—Specific finding of fact unobjected to is binding as against other evidence.

A specific finding of fact by court concerning nature of possession of land claimed by adverse possession is a finding against contrary evidence, which, in absence of exception, is binding on reviewing tribunal.

5. Railroads ⟐⟐63—Finding held insufficient to establish dedication of land.

In action of trespass to try title, a finding by court that plaintiff's predecessor, who was principal owner of railway, but not sole owner of land, intended to provide a right of way for railway, was insufficient to establish a dedication of land to railway, under rule that, to establish a dedication, intention of owner must be absolutely and irrevocably shown.

6. Railroads ⟐⟐63—Dedication of a 50-foot strip not presumed from acquirement of title to a 20-foot strip, by limitations.

Dedication of a 50-foot right of way cannot be presumed from acquiescence in use of a 20-foot strip by railway to which it has acquired title, by statute of limitations.

Appeal from District Court, Harris County; W. E. Monteith, Judge.

Action of trespass to try title by the John T. Brady Corporation against the International-Great Northern Railroad Company. From a judgment for defendant, plaintiff appeals. Reversed and rendered.

Hunt & Teagle, of Houston, for appellant. Morris, Sewell & Morris, of Houston, for appellee.

PLEASANTS, C. J. This is an action of trespass to try title brought by the appellant against the appellee to recover title and possession of a strip of land 51 feet in width running through Brady place, in the city of Houston, Harris county, Tex., from the east line of Drennan or Harriet street to the west

⟐⟐For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Writ of error granted December 10, 1925.

line of Ohio street or North Eastwood avenue, approximately 1,400 feet in length, said land lying 26 feet north and 25 feet south of the center line of the International-Great Northern Railroad's main line through said addition, less a strip of land 20 feet in width lying 10 feet on each side of the center line of said main line track, and the cross street intersections, and, also, in the alternative, praying for a mandatory injunction requiring the defendant to remove two switches on the land sued for and restraining the defendants from conducting or operating any switches, spurs, side tracks, passing tracks, or any other improvements thereon, or unloading or loading cars thereon, or to do anything which would add to the burden of said property.

The defendant answered by general demurrer, general denial, and special pleas of limitation of 5 and 10 years. It further pleaded that it had acquired an easement in the land by prescription through the long acquiescence of the owners who are now estopped to deny such easement. It further pleaded that the property was conveyed to it by its former owner, John T. Brady, under whom plaintiffs claim by deed, which was unrecorded and has been lost.

In the alternative it pleaded, in substance, that, if mistaken in such allegation that the said John T. Brady conveyed by deed the said land and premises to the railway company, then, at the time of the construction of the railroad, the said Brady was the principal stockholder and actual manager and superintendent of said line, building the said road over and across said land, thereby agreeing that said land and premises might be used by said railway company, and its predecessors in title, for right of way purposes, and, by reason thereof, said plaintiff, who is holding under the said John T. Brady, is estopped from denying the defendant's right to an easement.

By supplemental petition plaintiffs specially denied that the said John T. Brady during his lifetime had conveyed the lands in controversy to the Houston Belt & Magnolia Park Railway Company and averred that in truth and in fact the lands over which said railway was built constituted the homestead of John T. Brady and his family, who were in actual possession and use thereof at the time the said road was constructed; that it was built with the knowledge, consent, permission, and under the license of the said John T. Brady upon a strip of land 16 to 20 feet in width running across the homestead, but that plaintiff is not suing for such strip and same was not in controversy in this suit.

The trial in the court below without a jury resulted in a judgment in favor of the defendants, that plaintiffs take nothing.

At the request of plaintiffs the trial court filed the following findings of fact and conclusions of law:

"First. That John T. Brady and wife, Callie Tinsley Brady, were the owners of the property in controversy on the 23d day of February, 1874, and that the record title to the property in controversy is in the plaintiff in this case.

"Second. That the Houston Belt & Terminal Park Railway Company was incorporated under the general laws of the state of Texas on the —— day of February, 1889; that John T. Brady, last above mentioned, was one of the incorporators and the principal stockholder in said company, and was the moving spirit in the promotion of said company and the building of said railroad; that the charter of the Houston Belt & Magnolia Park Railway Company contains the following provision:

"'The purpose of this corporation shall be to construct, operate, and maintain a single or double track railway and telegraph line in said county of Harris at or near Buffalo bayou between the mouth of Brays bayou and Long Reach, and from thence to the city of Houston, and along such street in said city as the city council may define, with such branches as will enable said railroad to connect with any and all railroads leading to and from said city at a point within or without the city limits, the main line and branches in all to be about 15 miles in length; such railroad may be located so that it or any part thereof may be used as a belt or connecting line.'

"Third. That, prior to and at the time of the construction of the Houston Belt & Magnolia Park Railway, the said John T. Brady was the owner of a large tract of land through a portion of which said right of way of the Houston Belt & Magnolia Park Railway was constructed; that the said John T. Brady was on the ground a great deal of the time during the construction of said railway, and actually superintended the construction thereof; that at said time the property in controversy was acreage property situated a considerable distance from the city of Houston as it then existed; and that the lands above referred to, so owned by said Brady, were used for agricultural and grazing purposes, and had a value of about $—— per acre at said time.

"Fourth. I find that John T. Brady, Jr., inherited, under the will of his mother, Callie T. Brady, an undivided half interest in the land in controversy, which was partitioned, among other property, between John T. Brady, Sr., and his minor son, John T. Brady, Jr., in cause No. 13610, by decree entered therein May 26, 1890, and that tract No. 3 was set aside to John T. Brady, Sr., and tract No. 4 was set aside to John T. Brady, Jr., and that the division line between said two tracts is now the center line of defendant's main track. I further find that the plat attached to the degree in said partition does not show the railroad to have been built.

"Fifth. That in 1890 or 1891 the Houston Belt & Magnolia Park Railway was put in operation and that the road was constructed upon the 20-foot strip running through the land described in plaintiff's petition.

"Sixth. That at the time of the construction the Houston Belt & Magnolia Park Railway Company's dump was thrown up and certain trees were cut; that some of the trees cut were of considerable size and the stumps remained on the strip in controversy for several years,

some of the trees that were so cut being from 25 to 30 feet from the center of the main line of said railroad; that, during the construction of said road, building material such as the ties, rails, etc., were placed and stored at a distance of more than 20 feet from the center line of the main line as it was then constructed.

"Seventh. I find that the lands sued for pass over the homestead of the said John T. Brady and wife, but that the existence of such right of way and its use for railroad purposes did not interfere with the use and enjoyment of the homestead by the said John T. Brady and wife.

"Eighth. That John T. Brady died in 1891, leaving a last will and testament, by the terms of which his wife, Mrs. Estelle J. Brady, was appointed independent executrix thereof.

"Ninth. That Mrs. Estelle J. Brady, surviving wife of John T. Brady, after his death, and on July 9, 1891, filed her application to be appointed temporary administratrix of the estate of the said John T. Brady; that, among other things, the following statement was made in her said application:

" 'That a considerable portion of decedent's estate consists of a railroad, to wit, the Magnolia Park & Houston Belt Railroad, decedent being, in fact, almost the sole owner of the stock and bonds of the Magnolia Park & Houston Belt Railroad Company, which company is the owner of said railroad; that there was $700 or $800 of floating debts due laborers and secured by a lien on the same, and said property is liable to be sacrificed unless said floating indebtedness is paid at once.'

"Tenth. That on January 1, 1890, said John T. Brady and the Port Houston Land & Improvement Company conveyed to the Houston Land & Trust Company, trustee, for the purpose of securing the payment of certain bonds, 1,374 acres of land. Among the reservations made in the land so conveyed appears the following:

" 'All such right of way as has been granted to the Houston Belt & Magnolia Park Railway.'

"Said 1,374 acres of land was no part of the land in controversy herein, but laid some distance east thereof.

"Eleventh. That on January 31, 1890, J. J. and W. J. Settegast conveyed to John T. Brady 89.23 acres, which said tract adjoins on the east the tract of land owned by the said Brady over which the aforesaid railroad was constructed; that, after the death of said John T. Brady, Mrs. Estelle J. Brady, as independent executrix of the estate, on the 8th day of September, 1893, conveyed the 89.23-acre tract to Jonathan Frost by deed of record in volume 70, p. 70 to 73. In this deed the following reservation was made:

" 'From the above and foregoing described tract of land, however, is to be taken the right of way of Houston Belt & Magnolia Park Railway Company; the same being 60 feet in width.'

"Twelfth. That, at the time the said John T. Brady constructed the Houston Belt & Magnolia Park Railway, he foresaw and prophesied that at some future date Long Reach, the eastern terminus of said road, would be a great port, and that the city of Houston would be a great city, and in his vision saw and contemplated that at some time in the future, when deep water was made possible, and a port developed, a great amount of traffic would pass over the line of railroad he was constructing.

"Thirteenth. That the Houston Oak Lawn & Magnolia Park Railway Company was incorporated under the general laws of the State of Texas on March 15, 1899, and on May 16, 1899, said Houston Oak Lawn & Magnolia Park Railway Company acquired all of the property of the Houston Belt & Magnolia Park Railway Company, and that on December 26, 1903, said Houston Oak Lawn & Magnolia Park Railway Company was consolidated with the International & Great Northern Railroad Company by special act of the Legislature dated February 21, 1903, Twenty-Eighth Legislature, 1903, c. 5, p. 12, and that defendant is successor to all the property and rights which were acquired by said International & Great Northern Railroad Company by virtue of the aforesaid consolidation. And since said consolidation defendant and its predecessors have operated the railroad property formerly owned by the Houston Belt & Magnolia Park Railway up to the present time.

"Fourteenth. That, about the year 1916, the International-Great Northern Railway Company, defendant's predecessor, constructed a certain passing or storage track on one of the strips of land sued for, and that, during the year 1921, constructed another passing or storage track on the other strip of land sued for; that the main line is located on the 20-foot strip situated between the two strips on each side thereof sued for, the entire area including said 20-foot strip having on it at this time three tracks.

"Fifteenth. That defendant has no other access or route to reach the port of Houston except over the line formerly owned by the Houston Belt & Magnolia Park Railway above mentioned; that, since said property was acquired from the Houston Oak Lawn & Magnolia Park Railway in 1903, the amount of traffic handled over said line has increased many hundreds of folds, largely on account of the development of deep water and port, to that during the year 1903, approximately one-half million bales of cotton, besides large tonnage of other shipments, passed over said line to and from Port Houston.

"Sixteenth. I find that, for the purpose of operating a main line railway, a right of way of 60 feet is customary, and that the defendant and its predecessors in title have claimed a right of way of this width through the lands formerly belonging to John T. Brady as aforesaid, from the time they took over said properties in 1903 up to the present time, and that they have paid taxes thereon from the year 1914 on a right of way not less than 60 feet in width through said property, designating it as acreage, and prior to that time the payment and rendition was made on a lump basis, that is, as right of way generally along with its other right of ways, without designating the width or acreage thereof as related to the right of way in controversy or to any of its other right of ways; that the plaintiffs, and those under whom they claim, have also rendered and paid taxes on the property in controversy for a great number of years; that the taxes paid by both plaintiff and defendant, and those under whom each claims, were paid each year as they became due, and before such taxes became delinquent.

"Seventeenth. That, prior to the time the International & Great Northern constructed passing or storage tracks as aforesaid, the only use to which the strips of land in controversy were put was an occasional burning of the grass and the possible storing of ties and other material for the purpose of constructing and repairing the roadbed.

"Eighteenth. I find that the right of way projecting east from the property in controversy has been fenced and has been used and claimed by defendant and its predecessors in title to the extent of either 60 feet or in excess of 60 feet in width. I find that no fence has ever been constructed on the property in controversy by defendant railway company.

"Nineteenth. That the defendant and its predecessors have used and operated trains over this right of way on the main track from the time it was taken by them up to the date of the filing of this suit, and date of the trial; the actual ground used being that upon which the railway is constructed, and that, since the construction of the storage, passing, or switch tracks above mentioned, same have been used for switch, passing, and storage purposes.

".Twentieth. I find that, by reason of the increased traffic over said line, it is necessary for the operation of defendant's road to have the passing or storage tracks referred to at some point along the line which was originally owned by the Houston Belt & Magnolia Park Railway Company.

"Twenty-first. I find that there was no right of way projecting west from where the west line of the property in controversy was located, and said road was operated over the streets of the city of Houston.

"Twenty-second. I find the facts in this case do not present sufficient evidence to justify a finding of the existence of a deed from John T. Brady conveying the land in suit to the Houston Belt & Magnolia Park Railway Company, but I find ,when John T. Brady constructed said road over and across his land it was his intention to set aside and dedicate to said road a right of way 60 feet in width.

"Twenty-third. I find that it would be impossible to maintain and operate a double track on a 20-foot right of way and that it would require a 60-foot right of way to maintain and operate a double track and a telegraph line.

"Twenty-fourth. In the organization and construction of said railroad it was the intention of John . T. Brady to provide a right of way wide enough to construct thereon when necessary a double-track railroad and a telegraph line.

"Twenty-fifth. I find that, owing to the increased traffic passing over the railroad formerly owned by the Houston Belt & Magnolia Park Railroad Company, defendant is now contemplating the construction of a double track along said entire line in order to provide adequate facilities for the handling of such traffic.

"Twenty-sixth. I find that defendant, and those under whom it claims, have had peaceable and adverse possession of the land sued for, using and enjoying the same and claiming the .same against the world for more than 10 years after plaintiff's cause of action accrued.

"Conclusions of Law.

"From the foregoing facts I conclude as a matter of law that plaintiff is not entitled to recover the land sued for."

[1] This suit was filed December 13, 1922. Appellant assails the judgment of the trial court, on the ground that the facts found by the court and the evidence in the case are wholly insufficient to show such exclusive adverse possession by appellee as to give it title under the 10 years' statute of limitation. The proposition presenting this contention is as follows:

"The evidence conclusively showing the defendant's predecessor having been placed in possession of the 20-foot strip of land upon which its main line track was built by the consent and license of John T. Brady, one of the predecessors in title of plaintiff to that portion of the land lying south of the center line of defendant's main track, and there. being no evidence of any acts of possession or use of any other portion of said land, there was nothing to put plaintiff upon notice that defendant claimed an easement over or possession of the lands in controversy, so as to start the running of the statute, until the construction of the switches or passing tracks over and upon said land."

We think this contention is borne out by the record and must be sustained.

The only occupancy or possession of either of the strips of land in controversy prior to the building of the passing or storage track in 1916 and 1921, respectively, as found by the court in the sixth finding of fact before set out, was:

That "certain trees were cut; that some of the trees cut were of considerable size and the stumps remained on the strip in controversy for several years, some of the trees that were so cut being 25 to 30 feet from the center of the main line of said railroad; that, during the construction of said road, building material such as ties, rails, etc., were placed and stored at a distance of more than 20 feet from the center line of the main line as it was then constructed."

It goes without saying that the cutting of the trees and the temporary storing of material on the land of another by the owner of adjoining land is not such adverse possession, use, occupancy, and enjoyment as to give title (the other requirements of the statute of limitations being complied with) to the person so using the land of another. The adverse possession of land required by our statutes of limitation to divest the owner of his title must be such as to give notice to the owner that the person so using the land is claiming title thereto.

Our statute (Rev. St. art. 5681) defines the adverse possession required under our statutes of limitation as follows:

" 'Adverse possession' is an actual and visible appropriation of the land, commenced and continued under a claim of right inconsistent with and hostile to the claim of another."

It certainly cannot be reasonably contended that the occupancy and use of the land by appellee prior to 1916 found by the trial

court was adverse possession as defined by the statute above quoted. In the case of Word v. Drouthett, 44 Tex. 365, our Supreme Court, in discussing this statute, says:

"It is to be noted that it is not the peaceable occupation of the land which meets the requirement of the law, but it is the peaceable possession, the exercise of authority and dominion over it. The possession must be exclusive, or, as it is generally expressed, it must be 'actual, continued, visible, notorious, distinct, and hostile.' * * * It must neither be abandoned, yielded up, or held in subordination to, recognition of, or dependent upon, the will or right of another. He, who would claim by reason of his adverse possession, must, as has been said, 'keep his flag flying. * * *' His entry upon the land must be with intent to claim it as his own or hold it for himself, or his intention to do so, if conceived after going into possession for some other purpose, must be manifested by some open or visible act or declaration showing such purpose, in order to set the statute in motion in his favor."

[2] The right of a railway company to acquire title to land or an easement in or over land under our statutes of limitation is well settled, but to do this the possession of the land must be adverse as that term is defined in the statute, and any easement so acquired can extend only to the land actually used as such. 2 Elliott on Railroads (2d Ed.) art. 948.

[3] It is also well settled that appellee's adverse possession of the 20-foot strip of land would not give it constructive possession of the remainder of the land claimed by it, for the reason that appellant and its predecessors in title were in actual possession under their record title of a portion of the tract of land of which the land in controversy is a part and this gave them constructive possession of all the land in the tract not actually occupied by the appellee. In the case of Anderson v. Jackson, 69 Tex. 346, 6 S. W. 575, the court says:

"Partial possession under the older and better title gives constructive possession and seisin of the whole, and the holder of the title to the junior grant cannot set up the statute of limitations as to the conflict. This is even so when the latter is in possession under his deed at the time the former actually occupies his land. The better title immediately draws to a partial occupancy under it the constructive possession of the entire land covered by it not in the actual possession of a hostile claimant. * * * The controlling principle is that there can be but one constructive possession of the same land, and that, in case of conflict, the seisin and possession of the true owner must prevail over the alleged constructive possession of the one who holds under mere color of title."

This rule has been uniformly announced and followed by our courts. Evans v. Foster, 79 Tex. 49, 15 S. W. 170; Zimmerman v. Kennedy (Tex. Civ. App.) 52 S. W. 642.

No complaint is made by the appellant of the sixth finding of fact by the trial court and such finding is binding upon this court as to the extent and character of the possession and use of the land in controversy, by the appellee.

The twenty-sixth finding by the court, before set out, while included in the findings of fact, is more in the nature of a conclusion of law and must be regarded as based entirely on the specific possession and use of the land set out in the sixth finding; there being no evidence showing other character of possession or different use of the land.

One witness for appellee testified that all of the timber was cut off the land by appellee's predecessor at the time the railroad was constructed and that drainage ditches were placed along either side of the right of way now claimed by appellee. The undisputed testimony shows that, if ditches were ever placed on the land, they have long since disappeared.

[4] We think the specific finding of the trial court as to possession and use of the land by appellee is a finding against the testimony of the witness above mentioned, and is binding upon this court in the absence of any exception to the finding by appellee. If this is not the rule, however, and the testimony of the witness should be considered, it adds little or nothing to the character and extent of appellee's possession and use of the land, and does not sustain the conclusion of the trial court that appellees "have had peaceable and adverse possession of the land sued for, using and enjoying the same and claiming the same against the world for more than 10 years after plaintiff's cause of action accrued."

It only remains for us to determine whether the evidence is sufficient to raise the issue of a dedication of the land in controversy by Col. Brady for use as a right of way for the railroad.

In the twenty-fourth finding of fact the trial court finds:

"In the organization and construction of said railroad it was the intention of John T. Brady to provide a right of way wide enough to construct thereon when necessary a double-track railroad and a telegraph line."

[5, 6] This is far short of a finding of fact that Col. Brady dedicated the land in controversy to the railroad for right of way purposes. It is nothing more than a finding that as one of the organizers and the manager of the railroad during the period of its original construction he contemplated and intended that the road should acquire a right of way wide enough to construct, when necessary, a double-track railroad and a telegraph line, which the court finds upon sufficient evidence would require a right of way 60 feet wide. This finding by the court of Col. Brady's intention is amply sustained by

the evidence, but no dedication or free gift of the land by him can be presumed from this fact and the further fact that he constructed the road across land owned jointly by him and his son, John T. Brady, Jr., using for this purpose only the small strip of land necessary to operate a one track railroad. There is nothing more in the evidence from which a dedication could be inferred, other than long acquiescence by appellant in the use by the appellee of the 20-foot strip of land, to which it has acquired title by limitation, and to which appellant is not asserting any claim. Col. Brady died about a year after the road was constructed. No agreement on his part that the road should have the perpetual use of his land free of charge, and no statement by him that such was his intention, is shown by the evidence. No dedication of a right of way 50 feet wide can be presumed from the fact that appellant's predecessors in title permitted appellee to acquire title by limitation to the 20-foot strip. In order to establish a dedication of private property to public use the intention of the owner to so dedicate it absolutely and irrevocably must be clearly shown. Ramthun v. Halfman, 58 Tex. 551; Worthington v. Wade, 82 Tex. 28, 17 S. W. 520; Heilbron v. Ry. Co., 52 Tex. Civ. App. 575, 113 S. W. 610.

We do not think any reasonable inference or presumption of a dedication of the land in controversy could arise from the intention and acts of Col. Brady shown by the evidence. This conclusion is made stronger by the undisputed fact that at the time the road was constructed he was not the sole owner of the property, and, to draw the inference of a dedication, we should have to indulge in the unreasonable presumption that he gave to the railroad company, of which he was manager and principal owner, property which he knew he did not own. We do not think the issue of dedication is raised by the evidence.

These conclusions require that the judgment of the trial court be reversed, and, there being no undeveloped fact issue in the case, judgment is here rendered for appellant.

Reversed and rendered.