## INTERNATIONAL–GREAT NORTHERN R. CO. v. JOHN T. BRADY CORPORATION. (Nos. 644—4507.)

(Commission of Appeals of Texas, Section B. May 12, 1926.)

1. Railroads ⊚⇒68—Evidence held to raise issue whether owner of land dedicated 60-foot right of way for railroad purposes.

Evidence *held* to raise issue as to whether or not owner, who, with his family, owned land on which railroad was constructed, dedicated 60-foot right of way to use of company for railroad purposes, as against contention that only 20-foot right of way was dedicated.

2. Adverse possession ⊚⇒114(1)—Evidence held to sustain finding that railroad acquired easement in 60-foot right of way by adverse possession.

Evidence *held* to sustain finding that railroad, by use of land as rapidly as its necessities demanded and by storing of materials on it, acquired title to easement, for railroad purposes, in 60-foot right of way strip, by adverse possession.

3. Appeal and error ⊚⇒1114—Where Court of Appeals, if given opportunity, would reverse judgment as against weight of evidence, Supreme Court, though differing with Court of Appeals, can only remand case to trial court for another trial.

Where Court of Appeals not only held that there was no evidence raising issues on which trial court's judgment was based, but indicated that it would, if given opportunity, reverse judgment of trial court as against great weight of testimony, *held* that Supreme Court, though differing with Court of Appeals as to sufficiency of evidence to raise such issues, cannot affirm judgment of trial court, but will remand cause to trial court for another trial.

Error to Court of Civil Appeals of First Supreme Judicial District.

Action of trespass to try title by the John T. Brady Corporation against the International-Great Northern Railroad Company. Judgment for defendant was reversed and rendered by the Court of Civil Appeals (276 S. W. 719), and defendant brings error. Judgments of district court and Court of Civil Appeals reversed, and cause remanded for new trial.

Andrews, Streetman, Logue & Mobley, Morris, Sewell & Morris, and Wolters, Blanchard, Woodul & Wolters, all of Houston, for plaintiff in error.

Hunt & Teagle, of Houston, for defendant in error.

POWELL, P. J. The nature and result of this case have been fully stated by the Court of Civil Appeals. See 276 S. W. 719. The case was tried below without a jury, and the trial court's findings of fact and conclusion of law are set out in full by the Court of Civil Appeals. It is not necessary to repeat that statement here. The trial court found that the Brady Corporation was not entitled to recover the land sued for; it being a part of the right of way claimed and used by the railway company. Upon appeal, the Court of Civil Appeals reversed the judgment of the district court and rendered judgment in favor of the Brady Corporation. The opinion of the Court of Civil Appeals is based upon the theory that there was no evidence raising any issue upon which the railway company could retain this portion of its right of way.

The first assignment of error in the application, upon which this writ was granted, reads as follows:

"The Court of Civil Appeals erred to the prejudice of your petitioner in reversing the judgment of the trial court and in rendering judgment for appellant, notwithstanding findings of fact made by the trial court upon fact issues raised by adequate evidence, sufficient in legal effect to entitle your petitioner to the judgment rendered in its favor."

We think there was testimony raising two issues, either of which would have sustained the judgment of the district court; therefore it was error for the Court of Civil Appeals to render final judgment to the contrary. We shall now discuss the facts of the case with reference to those two issues.

In 1889, Col. John T. Brady, the owner of a large body of land near Buffalo Bayou and the city of Houston, had a vision of the latter's greatness as a port in the future. The twelfth finding of fact by the trial court is as follows:

"That, at the time the said John T. Brady constructed the Houston Belt & Magnolia Park Railway, he foresaw and prophesied that at some future date Long Reach, the Eastern Terminus of said road, would be a great port, and that the city of Houston would be a great city, and in his vision saw and contemplated that at some time in the future, when deep water was made possible, and a port developed, a great amount of traffic would pass over the line of railroad he was constructing."

---

⊚⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

He gave effect to his vision and chartered a railroad under the laws of Texas. The second and third findings of fact are as follows:

Second: "That the Houston Belt & Terminal Park Railway Company was incorporated under the general laws of the state of Texas on the —— day of February, 1889; that John T. Brady, last above mentioned was one of the corporators and the principal stockholder in said company and was the moving spirit in the promotion of said company and the building of said railroad; that the charter of the Houston Belt & Magnolia Park Railway Company contains the following provision:

"'The purpose of this corporation shall be to construct, operate, and maintain a single or double track railway and telegraph line in said county of Harris at or near Buffalo Bayou between the mouth of Brays Bayou and Long Reach, and from thence to the city of Houston and along such street in said city as the city council may define, with such branches as will enable said railroad to connect with any and all railroads leading to and from said city at a point within or without the city limits, the main line and branches in all to be about 15 miles in length; such railroad may be located so that it or any part thereof may be used as a belt or connecting line.'"

Third: "That, prior to and at the time of the construction of the Houston Belt & Magnolia Park Railway, the said John T. Brady was the owner of a large tract of land through a portion of which said right of way of the Houston Belt & Magnolia Railway was constructed; that the said John T. Brady was on the ground a great deal of the time during the construction of said railway, and actually superintended the construction thereof; that at said time the property in controversy was acreage property situated a considerable distance from the city of Houston as it then existed; and that the lands above referred to, so owned by said Brady, were used for agricultural and grazing purposes, and had a value of about $—— per acre at said time."

The road was constructed and put in operation as shown by the fifth finding of fact, as follows:

"That in 1890 or 1891 the Houston Belt & Magnolia Park Railway was put in operation and that the road was constructed upon the 20-foot strip running through the land described in plaintiff's petition."

It has been operated continuously since. It is now operated and owned by plaintiff in error here.

On the other hand, the fee-simple title to all the land formerly owned by Col. Brady has now passed into the Brady Corporation. In the beginning, 1874, this land belonged to Col. Brady and his wife, Callie. It does not appear in the record when she died, but it is shown that she willed to her son, John T. Brady, Jr.; her half of the land. The father and son partitioned the land by decree of court entered May 26, 1890. The division line in the partition aforesaid is now the center line of the main track of the railway company. It seems to be uncertain whether the partition preceded the building of the track, although the trial court does say that the plat attached to the partition decree did not show any railroad on it.

The Brady Corporation states that it thinks it fair to permit the railway company to retain 10 feet on each side from the center of the main track, and, solely because of its desire to be fair, no attempt was made to recover the 20 feet. But it does attempt to recover 40 feet (20 feet each side of the roadbed proper) which the railway company is now using as a right of way. Therefore the real controversy is whether or not this right of way was, by the intention of the interested parties, or by adverse use by the railway company, to be 60 feet in width or only 20 feet.

[1] We shall first address ourselves to the question as to whether or not the Bradys dedicated a 60-foot right of way to the use of the company for railroad purposes. The views of the trial court upon this point are evidenced by its twenty-second, twenty-third, and twenty-fourth findings of fact as follows:

Twenty-second: "I find the facts in this case do not present sufficient evidence to justify a finding of the existence of a deed from John T. Brady conveying the land in suit to the Houston Belt & Magnolia Park Railway Company, but I find when John T. Brady constructed said road over and across his land it was his intention to set aside and dedicate to said road a right of way 60 feet in width."

Twenty-third: "I find that it would be impossible to maintain and operate a double track on a 20-foot right of way, and that it would require a 60-foot right of way to maintain and operate a double track and a telegraph line."

Twenty-fourth: "In the organization and construction of said railroad it was the intention of John T. Brady to provide a right of way wide enough to construct thereon when necessary a double-track railroad and a telegraph line."

The Court of Civil Appeals agrees that a 60-foot right of way was necessary to a double-track railroad and telegraph line; in fact, no one could well question that finding. But the Court of Civil Appeals says above findings do not mean that there was such a dedication, but only that he intended to make such a dedication in the future and never did actually make it. We cannot agree with this interpretation of the findings of fact. We think the trial court intended to find that there was such a dedication at the time the road was constructed. The Court of Civil Appeals concedes that a dedication can be made as here contended for, but says the intention of the owner must be clearly shown. We think this is true, but we are strongly of the view that the facts in this case show not only that Col. Brady intended to dedicate the 60 feet to the use of his road, but that his son and his family generally joined him in that dedication. There was never any protest from any of them, even though the views

entertained by the family are clearly shown by instruments of record. Now, what did the various Bradys intend when they built the road on their own land? In view of the joint ownership, in a large measure, of the land and the railroad, there was no necessity for Col. Brady to pass a deed to the right of way to his own road. It would have been more businesslike to do so. But it can easily be seen why he did not think it necessary to observe that formality. Still, that he did set aside a right of way of some width is beyond dispute. For instance, the tenth finding of fact is as follows:

"That on January 1, 1890, said John T. Brady and the Port Houston Land & Improvement Company conveyed to the Houston Land & Trust Company, trustee, for the purpose of securing the payment of certain bonds, 1,374 acres of land. Among the reservations made in the land so conveyed, appears the following:

" 'All such right of way as has been granted to the Houston Belt & Magnolia Park Railway.'

"Said 1,374 acres of land was no part of the land in controversy herein, but laid some distance east thereof."

This is conclusive proof that Col. Brady had dedicated a right of way of some width to his railway company wherever it might be built, under its charter, on his land. It is true the 1,374 acres of land was no part of the property in suit, but he thought the road might be built thereon later. The charter shows he had more construction in mind than had been completed at that time.

The only question about which there can be any doubt, as we see it, is the width of this right of way so dedicated. We think there are many circumstances which show that the Bradys themselves set aside a strip 60 feet wide. It is true that the dump, slightly elevated, upon which the main track was to be laid, was only 20 feet wide; but there are circumstances which tend to prove that 60 feet was in the minds of the Bradys at that very time. In the first place, the very first thing done by Col. Brady, in building his road, was to cut out the right of way. He did this for a width of about 60 feet, as shown by the sixth finding of fact as follows:

"That at the time of the construction of the Houston Belt & Magnolia Park Railway Company's road a dump was thrown up and certain trees were cut; that some of the trees cut were of considerable size and the stumps remained on the strip in controversy for several years, some of the trees that were so cut being from 25 to 30 feet from the center of the main line of said railroad; that, during the construction of said road, building material, such as the ties, rails, etc., was placed and stored at a distance of more than 20 feet from the center line of the main line as it was then constructed."

It is clear to us that he must have done this because he knew that the efficient and safe operation of his railroad required a right of way of that width.

In the next place, the view of the Brady family is portrayed in the eleventh finding of fact as follows:

"That on January 31, 1890, J. J. and W. J. Settegast conveyed to John T. Brady 89.23 acres which said tract adjoins on the east the tract of land owned by the said Brady over which the 'aforesaid railroad was constructed; that, after the death of said John T. Brady, Mrs. Estelle J. Brady, as independent executrix of the estate, on the 8th day of September, 1893, conveyed the 89.23-acre tract to Jonathan Frost by deed of record in volume 70, at pages 70 to 73. In this deed the following reservation was made:

" 'From the above and foregoing described tract of land, however, is to be taken the right of way of Houston Belt & Magnolia Park Railway Company; the same being 60 feet in width.' "

The Colonel's widow must have heard the family discuss this matter. The railroad was, apparently, the pride of the Colonel. Evidently she must have heard in the family that its right of way was 60 feet in width. It is also in evidence that the Bradys acquiesced in the use for railroad purposes, from time to time, of the 60 feet.

It is difficult for us to think of any ground for concluding that Col. Brady, building a road of the kind described in his charter, could have set aside less than 60 feet for a right of way. At any rate, there is abundant evidence in the record raising this issue, and the Court of Civil Appeals erred in rendering final judgment contrary to this issue.

[2] On the other hand, even if it should be said that the Bradys dedicated no right of way at all, we are still of the view that there is evidence in this record sustaining the finding of the trial court that the railway company had acquired title to an easement, for railway purposes, in a 60-foot right of way strip by adverse possession. The pertinent findings of fact in this connection read as follows:

Sixteenth: "I find that, for the purpose of operating a main line railway, a right of way of 60 feet is customary, and that the defendant and its predecessors in title have claimed a right of way of this width through the lands formerly belonging to John T. Brady as aforesaid, from the time they took over said properties in 1903 up to the present time, and that they have paid taxes thereon from the year 1914, on a right of way not less than 60 feet in width through said property, designating it as acreage, and prior to that time the payment and rendition was made on a lump basis, that is, as right of way generally along with its other right of ways, without designating the width or acreage thereof as related to the right of way in controversy or to any of its other right of ways; that the plaintiffs and those under whom they claim have also rendered and paid taxes on the property in controversy for a great number of years; that the taxes paid by both plaintiff and defendant and those under whom each claims were paid each year as they became due, and before such taxes became delinquent."

Twenty-sixth: "I find that defendant and those under whom it claims have had peaceable and adverse possession of the land sued for, using and enjoying the same and claiming the same against the world for more than 10 years after plaintiffs' cause of action accrued."

We shall refer to the evidence which raises this issue. The railway was continuously operated. The undisputed evidence is that the 60-foot strip was used as rapidly as it was needed. In 1916 as the traffic of the company required, one passing track was constructed. In 1921, business still being on the increase, a second passing track was constructed. The only way the plaintiff in error reaches the port of Houston is over this railroad. It is now a very busy road. Prior to 1916, the only use the road had for the 60 feet, except the main line roadbed proper, was the storing of building materials. It used the right of way in that way. We quote from the seventeenth finding of fact as follows:

"That, prior to the time the International & Great Northern constructed passing or storage tracks as aforesaid, the only use to which the strips of land in controversy were put was an occasional burning of the grass, and the possible storing of ties and other material for the purpose of constructing and repairing the roadbed."

There is much evidence sustaining the sixteenth finding of fact, as well as the twenty-sixth, both of which we have already quoted.

Since the railway company used the land as rapidly as its necessities demanded, and since there was no use of it by others inconsistent with the railroad needs, then there was at least a constructive use of the entire 60 feet at all times, even when no ties were stored thereon and no grass was being burned. In this connection, we quote as follows from the case of Engine & Thresher Co. v. Barrow, 231 S. W. 368, by Section A of the Commission of Appeals:

"The uninclosed land of the Barrow tract was not put to a use inconsistent with homestead purposes; in fact, it was wild, uncultivated land, not used for any purpose. In a case of this character, until there is such inconsistent use, the law implies an intent to use, and therefore a constructive use of, the entire tract for homestead purposes, and prohibits the creation of liens thereon, except for the purposes stated in the Constitution. McDougall et al. v. Meginniss et al., 21 Fla. 362; Morrissey v. Donohue, 32 Kan. 649, 5 P. 27."

The Court of Civil Appeals concedes that an easement for right of way purposes may be acquired by limitation. For instance, we quote from its opinion as follows:

"The right of a railway company to acquire title to land or an easement in or over land under our statutes of limitation is well settled, but to do this the possession of the land must be adverse as that term is defined in the statute, and any easement so acquired can extend only to the land actually used as such." 2 Elliott on Railroads (2d Ed.) art. 948.

The Court of Civil Appeals then makes another statement, citing authorities in support thereof, as follows:

"It is also well settled that appellee's adverse possession of the 20-foot strip of land would not give it constructive possession of the remainder of the land claimed by it, for the reason that appellant and its predecessors in title were in actual possession under their record title of a portion of the tract of land of which the land in controversy is a part, and this gave them constructive possession of all the land in the tract not actually occupied by the appellee."

We think this is perhaps where the Court of Civil Appeals has fallen into error, if our views be correct. It must be remembered that the railway company has no deed conveying a fee-simple title to this right of way, whatever its width may be. The dominant estate in the strip of land, the legal title, is in the Brady Corporation. The only claim the railway company makes is that it has an easement for railway purposes. So long as the Bradys or their assigns do not interfere with the use of the land by the railway for its purposes, they have a perfect right to use it as they please. All courts hold that a farmer may cultivate a portion of the right of way if such cultivation does not interfere with railway uses where the title of the railway company is merely an easement conveyed by such farmer for railway uses. Of course, in many cases, the railways take deeds with absolute title to their right of way. In the case at bar, the land in suit could have been used interchangeably by all these parties, as it doubtless was. This distinction is recognized by the Court of Civil Appeals at Dallas in the case of T. & P. Railway Co. v. Gaines, 27 S. W. 266. We quote from their opinion as follows:

"In the case of Hays v. Railway Co., 62 Tex. 400, a similar case to this, the court held that the use of the right of way by a railway company for the term of 10 years did not, in an action of trespass to try title, bar the right of plaintiff to recover the title to the land; that such use of the land was not such possession as to apprise the owner of the fee that it was being claimed adversely to said owner. The court rightly held, in this case, that the owners' right to the fee was not barred. The defendant having disclaimed any right to the fee, the question as to the title was not in issue."

For the same reason, we would not hesitate, in the case at bar, to hold, as a matter of law, under the facts proved, that the railway company could not recover the fee in the land by adverse possession. But that is not the issue in this case as we understand it. That was not the issue in the Gaines Case, supra. That court stated the real issue in its case as follows:

"A single question is here presented for our consideration, which is: Does the adverse possession and continuous use of a strip of land for 18 years, as a right of way for the operation of trains by a railway company, create an easement over such land by prescription?"

In the Gaines Case, the court wrote a very brief opinion, but in our judgment a very correct one. It is well considered and all counsel in the case at bar admitted that it was the only Texas case dealing with the width of a right of way. It seems the case went no further than that court. We make two more brief quotations from the opinion therein as follows:

(1) "It is settled, we think, in this state, that the public may acquire the right of way for a public road over the land of another by prescription. Franklin Co. v. Brooks, 68 Tex. 681, 5 S. W. 819; Compton v. Bridge Co., 62 Tex. 722; Click v. Lamar [County], 79 Tex. 121, 14 S. W. 1048. We see no good reason why the same principle would not apply to railroads, in reference to right of way. We have been unable to find any case, where the necessary requisites existed, that the court has failed to hold in favor of an easement. Such authorities from other jurisdictions as we have been cited to, which have decided this question, hold that an easement can be acquired by a railroad by prescription. Organ v. Railway Co. [51 Ark. 235] 11 S. W. 103; Cogsbill v. Railway Co. [92 Ala. 252] 9 So. 512; and others."

(2) "All of the essential elements have been established by a preponderance of the evidence, by the railway company, in this case; in fact, there is no controversy as to the facts of the case. The railway took possession of the strip 18 years ago, with the knowledge of the owner, has held adverse possession ever since, using and enjoying the same, which use and enjoyment have been exclusive, uninterrupted, and continuous. In the absence of any direct testimony as to the claim of right to the strip, the manner of use and holding is sufficient to base a presumption that the railway was claiming adversely, and was sufficient to put the owners on notice of its claim to an easement in the land. We are of opinion that under the law and facts the railway company had acquired an easement in the land, by prescription, for a right of way. The judgment of the court below must therefore be reversed. As the evidence fails to show the width of the right of way so obtained, the case will be remanded for that to be determined. In the absence of anything to designate the exact extent of the boundaries of the right of way claimed, it must be confined to the roadbed proper, and such adjacent land as has been used and enjoyed by the railway company, in connection with the roadbed, for the purpose of operating its railway. The judgment is reversed, and the cause remanded."

[3] It is clear to us that there is much evidence in the case at bar showing that the land in suit, adjacent to the "roadbed" proper, has been used since 1903 by plaintiff in error and its predecessors, as stated in the sixteenth finding of fact by the trial court. The use was adverse. It was exclusive so far as railway needs required. The use enjoyed by the railway company in the instant case was all that was necessary "for the purpose of operating its railway." We think the evidence raises the issue which meets the test laid down in the Gaines Case, supra, which is a correct decision in our judgment. Therefore, for this additional reason, the Court of Civil Appeals herein was without authority to render final judgment against the railroad company.

While we differ with the Court of Civil Appeals in the two material respects stated, we are not at liberty to set aside its reversal and affirm the judgment of the trial court. Our reasons have been fully stated by the writer in the case of Barron v. Railway Co. (Tex. Com. App.) 249 S. W. 825, as follows:

"But, although we differ with the majority of the Court of Civil Appeals in its judgment as to the effect of the evidence in this case upon the issue of contributory negligence of Barron, we cannot set aside its reversal of this case and affirm the judgment of the trial court. The Court of Civil Appeals has held that, under the undisputed facts in this case, as it construes them, Barron was guilty of contributory negligence as a matter of law. It will be assumed, ordinarily, that this holding includes the lesser holding that a jury verdict, upon the same evidence, acquitting Barron of contributory negligence, would be held by the same Court of Civil Appeals to be against the weight of the evidence. See Lee v. Railway Co., 89 Tex. 583, 36 S. W. 63; Choate v. Railway Co., 91 Tex. 406, 44 S. W. 69; Lilienthal v. Indemnity Exchange (Tex. Com. App.) 239 S. W. 906. Assuming that the Court of Civil Appeals would also have held that the verdict on contributory negligence was against the weight of the testimony, the Supreme Court can only remand the case, for the Court of Civil Appeals can reverse and remand a case on the facts, as being against the weight of the evidence, and such a reversal is binding upon the Supreme Court.

"But in the case at bar we are not relegated to a reliance upon the assumption mentioned in the authorities just cited. For in this case the majority of the Court of Civil Appeals repeatedly, in a very long opinion, makes statements of facts which leave no doubt in our mind but that they would have remanded this case, in so far as the issue of contributory negligence is concerned, as being against the weight of the testimony and without sufficient support in the record. This being true, it is the proper practice to remand the case to the trial court and not invade the jurisdiction of the Court of Civil Appeals over the facts of the case. For two very recent authorities discussing this very question, we refer to Turley v. Campbell (Tex. Com. App.) 241 S. W. 682; Brown v. City Service Co. (Tex. Com. App.) 245 S. W. 656."

For still more recent cases to the same general effect as the Barron Case, we refer to Chapman v. Kellogg (Tex. Com. App.) 252 S. W. 156, and Marshburn v. Stewart, 113 Tex. 518, 254 S. W. 942, 260 S. W. 565.

In the case at bar, not only does the Court of Civil Appeals hold there is no evidence

raising either of the issues we have discussed at length, but that court indicates clearly that it would, if given an opportunity to do so, reverse the judgment of the trial court as being against the great weight of the testimony. In such a situation, we cannot affirm the judgment of the trial court.

For the reasons indicated, we recommend that the judgments of the district court and Court of Civil Appeals be reversed, and the cause remanded to the former for another trial not inconsistent herewith.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.

We approve the holding of the Commission of Appeals on the questions discussed in its opinion.